## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MOHSEN IBRAHIM**, | |
| Plaintiff, | |
| v. | Case No. 1:24-cv-02915 (TNM) |
| **MARCO A. RUBIO**, | |
| Defendant. | |

## <u>MEMORANDUM ORDER</u>

For nearly four decades, Mohsen Ibrahim worked as a security officer at the U.S. Embassy in Cairo. His tenure ended on a sour note. On his account, Ibrahim faced discrimination from his superiors. When he reported that discrimination, he set off a cascade of disciplinary actions that culminated in his firing. Ibrahim brings three claims under Title VII of the Civil Rights Act of 1964 and one claim under the Age Discrimination in Employment Act. The Secretary of State moves to dismiss. The Court grants that motion as to Ibrahim's Title VII hostile work environment claim, but it declines to dismiss the rest.

### I.

Mohsen Ibrahim is a U.S. citizen of Egyptian origin. Compl., ECF No. 1, ¶ 2. He is 65 years old. *Id.* ¶ 47. For 38 of those years, he worked for the U.S. Embassy in Cairo, most recently as an Operations Supervisor within the Local Guard Force ("LGF"). *Id.* ¶ 10. According to his Complaint, Ibrahim "received positive performance evaluations" throughout his service. *Id.* ¶ 11. That all changed in the fall of 2018, when Ibrahim allegedly "faced discriminatory behavior by Agent Alex Brinker and Deputy LGF Commander Fathy Abdel-Aziz," *id.* ¶ 12, including "[v]erbal attacks and confrontations," *id.* ¶ 31. Ibrahim flagged this

conduct to a superior and contacted an Equal Employment Opportunity ("EEO") counselor. *Id.* ¶ 13. His concerns were not only about race and national origin discrimination but also about "age discrimination in the selection process for the LGF Deputy position," for which he was "passed over . . . in favor of a less experienced, younger candidate." *Id.* ¶ 14.

In Ibrahim's telling, his discrimination complaints triggered a bevy of adverse actions. Weeks after his report, Ibrahim "was abruptly moved from his longstanding workstation of 38 years without valid justification." *Id.* ¶ 15. After Ibrahim "opposed the relocation and continued to protest the discrimination," he "was notified of a five-day suspension, effective immediately, based on alleged insubordination and misconduct." *Id.* ¶¶ 15–16. The Embassy also told him that his suspension made him ineligible for the Guard Force Commander position to which he had applied. *Id.* ¶ 19.

Following Ibrahim's unsuccessful appeal of his suspension, the Embassy began to investigate his conduct stretching back to 2016. *Id.* ¶¶ 20–21. The person overseeing that investigation was Agent Brinker—the same official whom Ibrahim had accused of discrimination. *Id.* ¶ 22. Brinker suspended Ibrahim's security certification due to the "pending investigation." *Id.* ¶ 24. Ibrahim insists that this was mere pretext, especially because the investigation had supposedly ended the month before. *Id.* A few days after losing his security certification, Ibrahim was placed on indefinite administrative leave and denied access to the workplace. *Id.* ¶ 25.

Then matters took a final turn for the worse. Almost one month into his administrative leave, Ibrahim "received a notice of intent to terminate his employment, citing the pretextual findings of the biased investigation." *Id.* ¶ 26. In the period that followed, Ibrahim alleges that the Embassy denied him any opportunity to respond, departing from its own written employment

policies.  *Id.* ¶ 28.  Various Embassy employees urged Ibrahim to resign, but he refused.  *Id.* ¶ 29.  Two months after the notice of intent, the Embassy fired him.  *Id.* ¶ 30.

These events are the fodder for Ibrahim's lawsuit.[1]  He asserts three claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, including one for race and national origin discrimination (or disparate treatment), one for unlawful retaliation, and one for a hostile work environment.  Compl. at 6–7.  Ibrahim also seeks relief on one count of age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*  Compl. at 7.  The Secretary moves to dismiss, and that motion is ripe.  Mot. to Dismiss, ECF No. 11; Pl.'s Resp., ECF No. 12; Reply, ECF No. 14.

## II.

In considering the Secretary's motion to dismiss under Rule 12(b)(6), the Court must determine whether the Complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *see* Fed. R. Civ. P. 12(b)(6).  The Complaint must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The Court must "treat the complaint's factual allegations as true and must grant the plaintiff[] the benefit of all inferences that can be derived from the facts alleged."  *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).  But the Court need not credit "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Evaluating a dismissal motion under Rule 12(b)(6) is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Robinson v.*

---

[1]  Ibrahim also filed a formal complaint with the Equal Employment Opportunity Commission, which investigated the allegations and rendered a final decision that Ibrahim does not further specify.  Compl. ¶¶ 8–9.

*Howard Univ., Inc.*, 335 F. Supp. 3d 13, 21 (D.D.C. 2018) (quoting *Iqbal*, 556 U.S. at 679), *aff'd sub nom. Robinson v. Wutoh*, 788 F. App'x 738 (D.C. Cir. 2019).

### III.

Ibrahim advances three Title VII claims—disparate treatment, retaliation, and a hostile work environment—as well as one ADEA claim.  The Court dismisses the hostile work environment claim.  The rest of them survive.  The Court first addresses the three Title VII claims and then turns to ADEA.

### A.

Start with disparate treatment.  Title VII bars federal agencies from discriminating in employment on various bases.  The statute dictates that "[a]ll personnel actions affecting employees . . . in [federal] agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  Although this provision's language differs from the one governing private employers, *cf.* 42 U.S.C. § 2000e-2(a), the D.C. Circuit has long "held that the two contain identical prohibitions."  *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (collecting cases).[2]

"[T]he two essential elements of a [Title VII] discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex,

---

[2]  In his reply brief, the Secretary argues that the standard for the federal sector should be different.  After all, "[t]he non-federal provision of Title VII . . . uses different language from the provision . . . applicable to the federal government."  Reply at 5.  For support, the Secretary cites *Babb v. Wilkie*, 589 U.S. 399 (2020), where the Supreme Court held that ADEA's federal sector provision imposes "a stricter standard" than its private sector counterpart because "ADEA's private- and public-sector provisions are couched in very different terms."  *Id.* at 410–11 (cleaned up).  The proposed takeaway:  Under the Secretary's reading of Title VII, "being moved from a workstation" is not a "personnel action[ ]" that infringes the federal sector provision.  *See* Reply at 7.  Whatever the merit of the Secretary's late-breaking legal argument, it would make no difference here as Ibrahim's relocation is only one of several more adverse employment actions that he alleges.  *See* Compl. ¶¶ 18–30.

[or] national origin . . . ." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (Kavanaugh, J.); *see also, e.g.*, *Stevenson v. Delta Airlines, Inc.*, 251 F. Supp. 3d 265, 267 (D.D.C. 2017) ("To state a plausible claim of disparate treatment, Plaintiff had to allege facts reflecting that (1) she suffered an adverse action (2) because of her race."). This "pleading burden is not great, and courts in this Circuit have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive a motion to dismiss." *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011) (cleaned up).

At this early stage, Ibrahim's disparate treatment claim carries that burden—though barely. He alleges that he had capably served the Embassy for almost four decades when he "faced discriminatory behavior by Agent Alex Brinker and Deputy LGF Commander Fathy Abdel-Aziz." Compl. ¶ 12. That behavior supposedly included "[v]erbal attacks and confrontations." *Id.* ¶ 31. Ibrahim reported these incidents to a superior. *Id.* ¶ 13. This, Ibrahim asserts, launched a string of "retaliatory actions"—including his removal from his longtime workstation, his suspension, an investigation led by the person whom he accused of discrimination, the revocation of his security certification and resulting administrative leave, and finally his termination. *Id.* ¶¶ 15–30. At various points in this disciplinary spiral, Ibrahim asserts that the agency deviated from its own written policies, for example by denying him "an opportunity to respond to the proposed termination." *Id.* ¶ 28; *see also, e.g.*, *id.* ¶ 29 ("Mr. Ibrahim was placed on administrative leave for a longer duration than permitted by the Local Employment Staff (LES) handbook.").

Ibrahim's Complaint is sparse on detail. The underlying events are open to dueling accounts. Some of his allegations are little more than legal conclusions, which alone are insufficient. But those issues can be addressed at summary judgment. *See Fennell*, 770 F. Supp.

2d at 128–29.  For now, Ibrahim's claim scrapes by.  *See, e.g.*, *Stevenson*, 251 F. Supp. 3d at 267 (concluding that plaintiff "sufficiently allege[d] a claim of race-based discrimination, albeit barely, because she identifie[d] the adverse employment actions purportedly taken against her— demotion and constructive discharge—and when they occurred"); *Fennell*, 770 F. Supp. 2d at 127–29 (holding that plaintiff "satisfied his pleading burden" for race and sex discrimination where he alleged "that his job performance throughout his career was impeccable" and that he was terminated based on false allegations); *Jackson v. Gallaudet Univ.*, 169 F. Supp. 3d 1, 5–6 (D.D.C. 2016) (ruling that claim of national origin discrimination survived dismissal where plaintiff alleged that "the very supervisor who made numerous anti-Jamaican remarks . . . had significant influence on the decision to terminate her employment" (cleaned up)).

## B.

Turn now to retaliation.  Title VII also forbids employers from discriminating against their employees for "oppos[ing] any practice made an unlawful employment practice by" Title VII.  42 U.S.C. § 2000e-3(a).  The D.C. Circuit has applied this anti-retaliation rule to federal employers.  *See Cruz v. McAleenan*, 931 F.3d 1186, 1193–94 (D.C. Cir. 2019).  To establish unlawful retaliation in this circuit, Ibrahim must show (1) that he opposed a practice he reasonably thought violated Title VII; (2) that the Embassy took adverse action against him; and (3) that the Embassy acted because of Ibrahim's opposition to the practice.  *See McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012); *accord, e.g.*, *Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 124–25 (D.D.C. 2023).  This claim "faces a relatively low hurdle at the motion to dismiss stage."  *Jones v. Bernanke*, 685 F. Supp. 2d 31, 40 (D.D.C. 2010) (collecting cases).

Like the disparate treatment claim, Ibrahim's retaliation claim clears the hurdle.  He pleads that he reported Agent Brinker's and Commander Abdel-Aziz's "discriminatory behavior" to his superior and that he "later initiated informal EEO counseling."  Compl. ¶¶ 12–13; *see, e.g.*, *Norris v. Wash. Metro. Area Transit Auth.*, 342 F. Supp. 3d 97, 115 (D.D.C. 2018) ("Informally complaining to an employer about discrimination is covered as a protected activity under Title VII . . . ."); 42 U.S.C. § 2000e-3(a) (prohibiting discrimination because an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter").  According to Ibrahim, this provoked an escalating set of "retaliatory actions."  Compl. ¶ 15.  "[W]eeks after his complaint," Ibrahim "was abruptly moved from his longstanding workstation of 38 years."  *Id.*  "[S]hortly after [he] opposed the relocation and continued to protest the discrimination in an email," a superior "recommended [his] suspension for alleged insubordination."  *Id.*  And things only worsened from there:  The suspension morphed into indefinite administrative leave and ultimately termination.  *Id.* ¶¶ 25–30.

In this posture, Ibrahim has done enough.  His Complaint supports a "plausible inference" that "his protected activity was a but-for cause" of the "adverse action" that followed. *See Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024); *see also id.* at 52 (stating that "[a] plaintiff can sometimes plead causation by relying solely on the fact that an adverse action shortly followed the plaintiff's protected activity" (collecting cases)).  To be sure, the Secretary "might very well rebut [Ibrahim's] claim on summary judgment."  *See id.* at 55.  "But that is for discovery to uncover."  *Id.*  Here, the Court finds "that the facts pled in this [C]omplaint, taken in totality, have nudged [Ibrahim's] claim across the line from conceivable to plausible."  *See id.* (cleaned up).

Case 1:24-cv-02915-TNM    Document 15    Filed 12/23/25    Page 8 of 12

**C.**

The same cannot be said for Ibrahim's hostile work environment claim.  To withstand dismissal, Ibrahim must plausibly show that the Embassy subjected him to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).  "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment'"—and that "'isolated incidents (unless extremely serious) will not amount to'" a hostile work environment. *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  After all, "[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."  *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003); *see also Foxworth v. McDonough*, 712 F. Supp. 3d 1, 11 (D.D.C. 2024) (noting that "courts in this jurisdiction frown on plaintiffs bootstrapping discrete claims of discrimination and retaliation into a broader hostile work environment claim").

Faced with this tall order, Ibrahim offers very little.  His allegations of a hostile work environment consist of four bullets in his Complaint—which point to (1) "[m]anagement soliciting adverse information about him from subordinates"; (2) "[v]erbal attacks and confrontations instigated by supervisors"; (3) "[a]ctions taken to tarnish his professional reputation and undermine his authority"; and (4) "[o]stracism and exclusion from meetings and communications essential to his role."  Compl. ¶ 31.

This claim has two fatal defects.  *First*, Ibrahim's allegations are too barebones even at the dismissal stage.  Ibrahim never specifies the "adverse information," explains what happened

in the "verbal attacks," or otherwise describes the "ostracism" he faced. *Cf. Bynum v. District of Columbia*, 424 F. Supp. 3d 122, 137–38 (D.D.C. 2020) (finding that plaintiff adequately pled a hostile work environment where she detailed defendant's offensive comments and the severe mental impact they had). That leaves him only with conclusory assertions, which do not make out a plausible hostile work environment claim even at this juncture. *See, e.g.*, *Stevenson*, 251 F. Supp. 3d at 268 (dismissing hostile work environment claim where plaintiff made the "largely conclusory" allegation "that she was forced to endure an atmosphere filled with constant threats of termination and demeaning conduct" (cleaned up)); *see also Baloch*, 550 F.3d at 1201 ("several verbal clashes with [a] supervisor" did not create a hostile work environment); *George*, 407 F.3d at 416–17 (concluding that plaintiff did not establish hostile work environment claim where she alleged "confrontations with her co-workers and . . . that she was thrice told to 'go back where she came from'").

*Second*, Ibrahim's hostile work environment claim largely repackages his disparate treatment and retaliation claims. His allegations that "[m]anagement solicit[ed] adverse information about him" and that it took "[a]ctions . . . to tarnish his professional reputation," Compl. ¶ 31, rehash his assertion that the Embassy retaliated against him by launching a "pretextual investigation into [his] conduct," *id.* ¶ 21. And his gesture toward "[v]erbal attacks and confrontations," *id.* ¶ 31, overlaps with the "discriminatory behavior" that informs his disparate treatment claim, *see id.* ¶¶ 12–13. The problem with this attempt to recycle disparate treatment and retaliation into a hostile work environment is that courts have consistently rejected that very move. *See, e.g.*, *Lester*, 290 F. Supp. 2d at 30–33 (dismissing plaintiff's hostile work environment claim premised on three allegedly discriminatory incidents and emphasizing that "it is not at all clear that mere reference to alleged disparate acts of discrimination against plaintiff

can ever be transformed, without more, into a hostile work environment claim"); *Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008) (ruling that plaintiff could not "simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim"); *Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005) ("The remainder of plaintiff's alleged 'hostile' events are the very employment actions he claims are retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim."). Allowing Ibrahim's claim to proceed would dilute the governing standard for hostile work environment claims.  *See George*, 407 F.3d at 416.  The Court rejects Ibrahim's bid to do so. Because Ibrahim fails to plead a hostile work environment, the Court dismisses his claim.

### D.

Move finally from Title VII to ADEA.  That statute dictates (with some exceptions) that "[a]ll personnel actions affecting employees . . . who are at least 40 years of age . . . in [federal] agencies . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a). This provision "hold[s] the Federal Government to a stricter standard than private employers or state and local governments."  *Babb v. Wilkie*, 589 U.S. 399, 411 (2020); *cf.* 29 U.S.C. § 623(a)(1) (making it unlawful for private employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age"); 29 U.S.C. § 630(b) (extending this prohibition to state and local governments).  "[U]nder § 633a(a), a personnel action must be made 'untainted' by discrimination based on age . . . ."  *Babb*, 589 U.S. at 405.  That "include[s] most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews."  *Id.* (citing 5 U.S.C. § 2302(a)(2)(A)).  In other words, "[i]f age

discrimination plays any part in the way [the federal employer's] decision is made," then the plaintiff has a viable ADEA claim. *See id.* at 406.

Ibrahim states a plausible ADEA claim. He is 65 years old. Compl. ¶ 47. Throughout his 38 years at the Embassy, he supposedly "received positive performance evaluations and was recognized for his dedication and service." *Id.* ¶ 11. Still, he alleges, the Embassy denied him a promotion to LGF Deputy, "passing over [him] in favor of a less experienced, younger candidate." *Id.* ¶ 14. After Ibrahim communicated his concerns about age discrimination both to his Embassy superior and an EEO counselor, the Embassy instigated the (by now well-known) disciplinary process that ended in his firing. *Id.* ¶¶ 15–30.

As with his surviving Title VII claims, Ibrahim's Complaint is stingy on detail. More will be needed to withstand summary judgment. At this point, though, Ibrahim's allegation that the Embassy passed him over for a younger candidate makes it plausible that "age discrimination play[ed] a[] part" in the Embassy's decision not to promote and later discipline and terminate him. *See Babb*, 589 U.S. at 406; *see also, e.g.*, *Washington v. D.C. Hous. Auth.*, 170 F. Supp. 3d 234, 241–42 (D.D.C. 2016) (holding that ADEA claim overcame dismissal where plaintiff "claim[ed] to have been 'eminently qualified' for his position," alleged that "his position was abolished," and asserted that younger employees "were treated more favorably than he was"); *Montgomery v. Omnisec Int'l Sec. Servs., Inc.*, 961 F. Supp. 2d 178, 183–84 (D.D.C. 2013) (denying motion to dismiss ADEA claim where plaintiff "stated that she endured younger officers being treated better and given better . . . assignments, even though she had seniority and more experience than them" (cleaned up)).

\* \* \*

In sum, Ibrahim fails to state a hostile work environment claim, but his other claims survive for now.

### IV.

For the reasons explained above, it is hereby

**ORDERED** that Defendant's [11] Motion to Dismiss is **GRANTED** as to Plaintiff's Title VII hostile work environment claim, and that claim is accordingly **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that Defendant's [11] Motion to Dismiss is **DENIED** as to all other claims.


Dated: December 23, 2025                           _____
                                                    TREVOR N. McFADDEN, U.S.D.J.